IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JONATHAN OKERE,                 )
                                )
        Plaintiff,          )
                                )
  v.                            )    Case No. 14 C 10115
                                )
CHICAGO TRANSIT AUTHORITY,      )
                                )
        Defendant.          )

## MEMORANDUM OPINION AND ORDER

Jonathan Okere ("Okere") has sued his employer, the Chicago Transit Authority ("CTA"), claiming employment discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"). Now before this Court for decision is CTA's motion for summary judgment under Fed. R. Civ. P. ("Rule") 56.

### Summary Judgment Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is

warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**Background**[1]

For the reasons given in the next section, this opinion adopts the description of the record presented in CTA's LR 56.1(a) statement of facts as to which there is no genuine dispute. In brief, all such facts are deemed admitted -- Okere has neither challenged nor supplemented them.

Okere, who is of Nigerian origin, is employed by CTA as a Combined Rail Operator (C. St. ¶ 2). His position is considered "safety sensitive" (C. St. ¶ 9).

On September 21, 2013 Okere was scheduled to ride alongside the operator of a Green Line train from Harlem Avenue south to Cottage Grove Avenue and then to operate the train on its northbound return run to Harlem (C. St. ¶ 22). Due to service disruptions that day, however, Okere was needed to operate the train on its initial southbound run from Harlem to Cottage Grove (C. St. ¶¶ 24, 26).

So Manager Roman Alvarado ("Alvarado") radioed Okere and told him to leave the southbound train he was riding (C. St. ¶¶ 27, 28). Okere did not (C. St. ¶ 28). Alvarado then explained that Okere was needed to operate a southbound train and again instructed him to leave the train he was on and wait for the other one to be delivered (C. St. ¶ 28). Okere again refused to comply (C. St. ¶ 28).

As a result Alvarado told Okere to meet him at the manager's office at the Madison/Wabash station (C. St. ¶ 28). When Alvarado arrived at that station, though, Okere was nowhere to be found (C. St. ¶ 29). Okere had instead ridden the train he had been on all the way

---

[1] This opinion refers to the parties' memoranda as "Mem. --" or "Reply --," as appropriate, and their LR 56.1 submissions as "St. ¶ --," with identifying prefixes of "C." for CTA and "O." for Okere.

to Cottage Grove (C. St. ¶ 30). Alvarado then repeated his order that Okere meet him at the Madison/Wabash station (C. St. ¶ 30).

When Okere finally did arrive some 30 minutes later, he got into a heated argument with Alvarado (C. St. ¶ 31). Alvarado had never seen someone behave as Okere was acting, but he had been trained to detect signs of alcohol and drug abuse and understood that aggressiveness was one such indication (C. St. ¶¶ 32-33). Citing Okere's refusal to comply with orders and his erratic behavior, Alvarado sent him for alcohol and drug testing (C. St. ¶ 34). That test came back negative (C. St. ¶ 36).

Okere was nonetheless referred to another Manager, Karis Conner ("Conner"), for an interview about (1) his refusal to follow Alvarado's instructions and (2) the later confrontation between the two (C. St. ¶ 36). Following that meeting Conner charged Okere with a Gross Misconduct/Behavioral Violation for poor work performance, insubordination, abuse of company time and conduct unbecoming an employee (C. St. ¶ 37). Okere was given a three-day suspension and placed on probation for six months (C. St. ¶ 37).

That same day another employee had left the terminal one minute earlier than his schedule required but was not, Okere says, told to take an alcohol and drug test (C. St. ¶ 58). And a second employee had left the terminal late but also was not tested for substance abuse (C. St. ¶ 59). Okere admitted at his deposition, however, that the second employee was not at fault for that delay and had no interaction with Alvarado (id.).

That was not the only incident that gave rise to Okere's Title VII claim. On April 14, 2014 he was assigned to the Harlem terminal yard to work as an Extra Switchman, which involves operating a machine called a "Sleet Fighter" during inclement weather in addition to all the regular duties of a Switchman (C. St. ¶¶ 38-40). On that day he was under the supervision of

a different Manager, Tomyka Latson ("Latson") (see C. St. ¶¶ 41-42). When Latson ordered Okere to operate the Sleet Fighter a second time during his shift, he refused based on his interpretation of a grievance arbitration award (the "Fleischli Award") (C. St. ¶ 41).

As a result of that refusal Latson ordered Okere out of service and directed him to see her supervisor Gwennette Jordan ("Jordan") the following day (C. St. ¶ 42). Jordan too charged Okere with a Gross Misconduct/Behavioral Violation for insubordination (C. St. ¶ 43). Under CTA disciplinary regulations such a second violation could have resulted in Okere's referral to the General Manager for possible discharge, but Jordan instead gave him a three-day suspension and twelve months' probation (C. St. ¶ 43 and Ex. 18). Later a neutral arbitrator determined that Latson's order and Jordan's consequent discipline did not violate the Fleischli Award or the Collective Bargaining Agreement (C. St. ¶ 44).

Okere points to three other employees who were not asked to operate the Sleet Fighter or disciplined for failing to do so (C. St. ¶ 60). But he does not know if they refused any work assignments or whether anyone issued them any direct orders that they could have disobeyed (C. St. ¶¶ 61-62).

Shifting from a defensive posture to the offensive, Okere filed two charges against CTA with the Equal Employment Opportunity Commission ("EEOC") on December 2, 2013 and May 13, 2014 respectively (C. St. ¶ 5). Then he filed this action on September 17, 2014 (C. St. ¶ 7), and two weeks later (on September 30) EEOC sent him his right-to-sue letter (C. St. ¶ 6). Okere then filed a single-count Amended Complaint on February 24, 2015, charging that he had been subjected to national-origin discrimination in violation of Title VII (C. St. ¶ 7).

## **LR 56.1 Requirements and Okere's Limited Compliance**

LR 56.1(a) requires each Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each fact alleged. Then LR 56.1(b) requires each

nonmoving party to respond point by point, with citations to the record in support of (1) any claimed dispute as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert.

As taught by such cases as <u>Ciomber v. Cooperative Plus, Inc.</u>, 527 F.3d 635, 643 (7th Cir. 2008) (internal quotation marks omitted):

District courts are entitled to expect strict compliance with Rule 56.1.

Accordingly they may disregard facts presented in any manner that does not comply with that rule (<u>id.</u>), including references to depositions and other discovery materials that appear only in supporting briefs (<u>Markham v. White</u>, 172 F.3d 486, 490 (7th Cir. 1999)). Where a party fails to deny an LR 56.1(a) factual allegation or neglects to support its denial with a specific reference to the record, that allegation is ordinarily deemed admitted for purposes of the motion (LR 56.1(b)(3)(C); <u>Ammons v. Aramark Uniform Servs. Inc.</u>, 368 F.3d 809, 817-18 (7th Cir. 2004)). Nevertheless, a district court should consider facts as admitted only if the allegations in the movant's own LR 56.1(a) statement are themselves "properly supported by references to the record or other evidentiary material" (<u>Stewart v. McGinnis</u>, 5 F.3d 1031, 1034 (7th Cir. 1993)).

Okere's response to CTA's LR 56.1(a) statement is highly problematic in those terms: It neither supplements that statement with additional facts that would require the denial of summary judgment nor -- more importantly -- does it effectively controvert any of the facts put forward by CTA. Instead, to each numbered paragraph in CTA's statement of facts Okere responds with either (1) an admission, (2) a flat denial without any specific reference to the record or (3) this nonsensical response:

> Plaintiff does not have sufficient information to either admit or deny paragraph [--] of SMF[2] and neither admits nor denies same but requires strict proof thereof.

But McGuire v. United Parcel Serv., 152 F.3d 673, 675 (7th Cir. 1998) has long since held that an almost identical statement triggers the automatic admission provision of LR 56.1(b)(3)(C) (then LR 12(N)(3)(b)).

To be sure, Okere's assertion of ignorance may be appropriate at the pleading stage or in responding to requests to admit -- although even there his demand for strict proof, which has become almost a tic among some members of the bar, is wholly out of place in any pleading (see App'x ¶ 1 to this Court's opinion in State Farm Mut. Auto. Ins. Co. v. Riley, 199 F.R.D. 276, 278 (N.D. Ill. 2001)). But here CTA's motion is one for summary judgment, and what is called for in response is not whether Okere admits or denies the truth of an assertion but whether he can controvert it with evidence of his own. If Okere cannot do so as to any statement supported by record evidence, he must admit that there is no genuine issue as to that fact. Outside of the limited circumstances governed by Rule 56(d), which is inapplicable here, it is therefore never appropriate to respond to such an LR 56.1 statement by protesting an inability to admit or deny it.

Far graver than the issues just mentioned is the substance of Okere's own LR 56.1(b) statement. This Court cannot comprehend how some of the denials or assertions of ignorance contained in that statement were made in the good faith required by Rule 11(b)(4). For example, O. St. ¶¶ 41, 44, 46, 48 and 52 deny or plead an inability to answer non-argumentative descriptions of Okere's own deposition testimony or Amended Complaint or answers to interrogatories. And O. St. ¶¶ 8, 9, 11-17, 21, 35 and 51 do the same in response to plainly

---

[2] "SMF" is the acronym employed by Okere's counsel to refer to CTA's LR 56.1 Statement of Material Facts.

accurate document summaries.  Hence the Conclusion to this opinion includes a rule to show cause.

In any event, the teaching of LR 56.1(b)(3)(C) plus Ammons, 368 F.3d at 817-18 and McGuire, 152 F.3d at 675 is clear.  All of the facts in CTA's LR 56.1(a) statement are supported by specific references to the record[3] and so are deemed admitted.

## Employment Discrimination

Title VII (in 42 U.S.C. § 2000e-2(a)(1)) makes it an unlawful employment practice for any employer

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

As reiterated in Morgan v. SVT, LLC, 724 F.3d 990, 995 (7th Cir. 2013), to succeed in a Title VII employment discrimination lawsuit a plaintiff must show (1) membership in a statutorily protected class, (2) an adverse employment action or hostile work environment and (3) that the employer took the adverse action because of the plaintiff's membership in the protected class.

**Adverse Employment Action**

For an employment action to give rise to a discrimination claim under Title VII, it must "materially alter the terms or conditions of employment" (Porter v. City of Chicago, 700 F.3d

---

[3] In C. St. ¶ 58 the first sentence is supported by the portions of the record referred to in C. St. ¶ 57 rather than the portion cited following that paragraph's second sentence (compare C. St. ¶ 58 with C. St. Ex. 2 at 151:8-19 and C. St. Ex. 2 at 363:13-22), but that editorial mistake does not detract from CTA's compliance with LR 56.1(a).

944, 954 (7th Cir. 2012)).[4] In that regard "not everything that makes an employee unhappy is an actionable adverse action" (id. (internal quotation marks omitted)). Instead "the action must be more disruptive than a mere inconvenience or an alteration of job responsibilities" (id. (internal quotation marks omitted)). As Barton v. Zimmer, Inc., 662 F.3d 448, 453-54 (7th Cir. 2011) has summarized:

> Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.

Nonetheless the operative test requires only that the change be "significant," and "exactly what that means will vary on the facts of a given case" (Ellis v. CCA of Tenn., LLC, 650 F.3d 640, 649 (7th Cir. 2011)).

As to the particular subject of alcohol and drug testing, Stockett v. Muncie Ind. Transit Sys., 221 F.3d 997, 1001-02 (7th Cir. 2000) has said:

> [U]nder circumstances where a drug test is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees, requiring that the employee submit to the drug test as a condition of employment may be an adverse employment action that is actionable under Title VII.

But in Stockett, id. at 1002 our Court of Appeals found that requiring an employee to take a drug test after the employer had received a report that the employee was using drugs, after a trained observer had determined that he exhibited the signs of intoxication and pursuant to a published drug policy did not run afoul of that test.

---

[4] By contrast, retaliation claims can be based on less significant changes or actions altogether outside of the employment context (Huri v. Office of the Chief Judge of the Circuit Court of Cook County, 804 F.3d 826, 833 and n.3 (7th Cir. 2015)).

So Okere's extended quarrel with his having been sent for drug testing at all does not state an actionable claim. There is no evidence (1) that the manner in which the tests were conducted was harassing or humiliating or (2) that supports Okere's assertions at O. Mem. 2, 8 and 33 that CTA's drug and alcohol testing policy was not strictly or equally enforced. And Okere's persistence in citing the policy applicable only to non-safety-sensitive employees to urge that Alvarado's action somehow did not conform to established procedures (O. Mem. 11, 19) -- even after the incontrovertible inapplicability of that policy was pointed out to him by CTA C. St. ¶ 54) -- is baffling.

Okere's remaining arguments on that score amount only to the assertion that the drug and alcohol test was improper because he did not exhibit any indication of being under the influence of a controlled substance (O. Mem. 8 n.1, 19). But in adverting to the list of such indications contained in CTA's policy manual -- which mirrors the listing that the Federal Transit Administration specifies as requiring testing (compare C. St. Ex. 10 at CTA001862 with 49 C.F.R. § 666.43(a)-(b)) -- he fails entirely to mention the one that Okere was seen to manifest: behavior. Alvarado was trained to identify the signs of possible alcohol or drug use, and Alvarado's reasonable suspicion based on specific, contemporaneous and articulable observations about Okere's abnormally erratic behavior sufficed under the policy that applied to Okere (see C. St. Ex. 10 at CTA001862). Nothing on the record other than Okere's unsubstantiated innuendo stands against the obvious conclusion that he was sent for testing pursuant to CTA's regular and legitimate practices.

Nor does a single occasion on which Okere was asked to drive the Sleet Fighter twice in one night or to work an additional assignment constitute a materially adverse employment action. It may fairly be assumed that when that machine is needed, conditions are such as to render

operating it unpleasant.  But one occurrence when it might have been unfair to ask Okere rather than one of his co-workers to do so, either because he had already been given his allotment of assignments or because it was in some sense their turn to perform that particular task, does not even begin to approach anything like constructive discharge, and no evidence suggests that it was otherwise a significant change to Okere's conditions of employment.

With all of that said, only one adverse employment action remains for consideration: Okere's two suspensions without pay, which of course affected his compensation.  Thus this opinion proceeds to the question of discriminatory intent solely as to those suspensions.

**<u>Discriminatory Intent</u>**

Where a Title VII claim is predicated on a plaintiff employee's race, color, religion, sex or national origin, the employee need show only that his status was a motivating factor in an adverse employment action (<u>EEOC v. Abercrombie & Fitch Stores, Inc.</u>, 135 S. Ct. 2028, 2032 (2015)).  As such cases as <u>Martino v. W. & S. Fin. Group</u>, 715 F.3d 195, 201-02 (7th Cir. 2013) have explained, there are two recognized frameworks for establishing the requisite discriminatory intent:  the direct method that relies on direct or circumstantial evidence and the indirect method derived from the burden-shifting formula of <u>McDonnell Douglas Corp. v. Green</u>, 441 U.S. 792 (1973).

It may well be that in Okere's mind every ill that he suffers is motivated in part or in whole by his Nigerian origin or that the ill would not have befallen him but for that origin.  But when Okere's attempts to paint CTA's reason for punishing him as pretextual, and when his contention that others who were similarly situated were treated better are subjected to objective -- not purely self-centered -- scrutiny, those fancied causal relationships call into play Alexander Pope's well-known aphorism in his <u>Essay on Criticism</u> ll. 561-62 (1711):

> All seems infected that th' Infected spy,
> As all looks yellow to the jaundic'd Eye.

Although this opinion could be lengthened by an extended analysis of the dual methods establishing discrimination and Okere's total failure under each, any such discussion is unnecessary because of the undisputed and critical differences that render his claimed comparators totally noncomparable. Thus Conner's write-up punished Okere for his unexplained refusal to follow direct instructions and his unacceptable disrespect toward his supervisors, not for violating CTA's drug and alcohol policy -- and not one of his fellow employees who were not disciplined was guilty of such insubordination. And the same is true of Jordan's punishment of Okere for violating an order to perform his job duties that he actually did violate -- an offense that none of Okere's supposed comparators committed or was charged with.

Indeed, all five non-Nigerian employees whom Okere identifies were treated similarly with respect to the standards to which they were held -- the fact that they were not disciplined resulted instead from the fact that they did not refuse direct orders or hurl invectives at their managers. Indeed, Okere ascribes no remotely comparable wrongdoing to his purported comparators that would render his 2014 suspension suspect. Thus he concedes that the train operator who left the Harlem terminal late on September 21, 2013 was not similarly situated (O. Mem. 2). And his other coworker's departure from the station one minute early that day is not an infraction in any way comparable to Okere's.

In short, the undisputed facts on the record establish that Okere is a repeatedly insubordinate employee who also happens to be Nigerian. He was punished for his insubordination, not for being from Nigeria.

**Conclusion**

For the reasons stated in this opinion, CTA's motion for summary judgment (Dkt. No. 43) is granted, and judgment is ordered to be entered in favor of CTA and against Okere. And pursuant to Rule 11(c)(3) Paul Otobusin, the attorney who signed Okere's LR 56.1(b) submission, is ordered to appear before this Court on July 6, 2016 at 9:15 a.m. to show cause why he and his client should not be sanctioned for denials and assertions of ignorance that violated Rule 11(b)(4).

_____
Milton I. Shadur
Senior United States District Judge

Date: June 29, 2016